1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,      : 25-CR-0039(CBA)
                               :
                               :
                               :
      -against-                : United States Courthouse
                               : Brooklyn, New York
                               :
                               :
                               : February 28, 2025
ALAIN TZVI BIBLIOWICZ          : 11:00 a.m.
MITRANI,                       :
                               :
          Defendant.           :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPEAL
BEFORE THE HONORABLE CAROL BAGLEY AMON
UNITED STATES SENIOR DISTRICT COURT JUDGE

A P P E A R A N C E S:

For the Government:   JOHN J. DURHAM
                      Interim United States Attorney
                      Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                 BY:  PHILIP PILMAR
                      Assistant United States Attorney

For the Defendant:    LEWIS BAACH KAUFMANN MIDDLEMISS, PLLC
                      The Chrysler Building
                      155 East 44th Street
                      New York, New York 10017
                 BY:  ANTHONY CAPOZOLO, ESQ.
                 BY:  ADAM KAUFMAN, ESQ.

Court Reporter:  Michele Lucchese, RPR, CRR
                 225 Cadman Plaza, 373N
                 Brooklyn, New York 11201
                 718-613-2272
                 e-mail:  MLuccheseEDNY@gmail.com
Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

```
                        Proceedings                      2
```

1       THE COURTROOM DEPUTY:  Good morning.  This is

2   criminal cause for a bail appeal, 25-cr-39, USA versus Alain

3   Bibliowicz.

4       Will the parties please state your name for the

5   record, starting with the Government.

6       MR. PILMAR:  Good morning, Your Honor.  Philip

7   Pilmar for the Government.

8       THE COURT:  Good morning.

9       MR. CAPOZZOLO:  Good morning, Your Honor.  Anthony

10  Capozolo and Adam Kaufman, who is waiving his appearance for

11  the purpose of this detention.

12      THE COURT:  Good morning.  Everyone can be seated.

13      It occurred to me, counsel, that the Government

14  might elaborate here today on information that wasn't perhaps

15  presented before the magistrate judge in Florida.

16      Do I understand correctly that your client is

17  waiving his appearance even under those circumstances?

18      MR. CAPOZZOLO:  Judge, I am.

19      Mr. Kaufman, who has been dealing with Mr.

20  Bibliowicz for an extensive period of time, has a pretty good

21  grasp on the underlying facts.  If there is something so out

22  of the ordinary, I will flag that to the Court.  If we need to

23  confer with our client enough that we can get back to the

24  Court, I will raise that.  I'm over 90 percent sure we don't

25  need to do that.

Proceedings                                                    3

1      THE COURT:  Okay.  That's fine.

2      Perhaps the first thing the Government can advise

3  the Court of is the exact terms of the bond that was set in

4  Florida, because I have read the transcript.  I have looked at

5  the bond itself, but I still wasn't clear on it.

6      Can the Government advise the Court of that?

7      MR. PILMAR:  Yes, Your Honor.  I was also a little

8  confused based on the transcript because the judge down there

9  used some terms that we don't use in the Eastern District of

10  New York.  I have conferred with defense counsel about that.

11  And if Your Honor -- obviously this is putting the cart before

12  the horse, but if Your Honor is inclined to grant bond, I

13  think the parties would like to discuss modified bond terms

14  with you that is more consistent with the practice in the

15  Eastern District of New York.  But the bond, as I understand

16  it, and defense counsel please jump in if I am incorrect, is

17  that the judge ordered the defendant released on a $5 million

18  bond with $100,000 corporate surety bond, which I believe

19  means that it actually is either used by a bail bondsman or

20  some kind of cash deposit with the Court.

21      THE COURT:  I thought there was also a 10 percent

22  cash requirement.

23      MR. CAPOZZOLO:  Yes, Judge.  It is $500,000 -- I'm

24  sorry -- $5 million bond, secured by four cosigners, 10

25  percent cash deposited with the Court, and the cash security

Proceedings                                                    4

1   bond, which is the old-fashion bail bond, which they still use

2   in Florida.

3              THE COURT:  We don't use those here.

4              MR. CAPOZZOLO:  No.

5              THE COURT:  And then how many individuals signing

6   the bond?

7              MR. PILMAR:  I believe four was proposed, but then

8   -- I understood counsel to say that there was a fifth person

9   available at the hearing.

10              MR. CAPOZZOLO:  I believe it is another family

11   member would sign the bond.  It was the mother, who her assets

12   are not large, but she was essentially going to sign on

13   because she would be there.  She offered to live with the

14   defendant while he is out as an additional assurance of his

15   remaining in the country.

16              THE COURT:  And who are the other suretors?

17              MR. CAPOZZOLO:  Doug Shapiro, Yuri Shapiro, I

18   believe, and his son Eli.  There was one other individual.

19   I'm sorry, Judge, I don't have the name.

20              THE COURT:  Wasn't his son a signatory?

21              MR. CAPOZZOLO:  His son was one of the signatories.

22              THE COURT:  He is only 20.

23              MR. CAPOZZOLO:  He's a young man.  The other

24   individuals were going to -- they had agreed, and it's in the

25   transcript, not to further encumber their properties while the

Proceedings                                                                      5

1   case is pending.  One has equity in their home of about a

2   million dollars, and another -- I'm sorry it's his brother.

3              THE COURT:  Are they posting their homes?

4              MR. CAPOZZOLO:  See, I believe we would need to do

5   that here in the normal practice.  Essentially, they made a

6   verbal commitment not to encumber their homes, and that would

7   part, I think, of the modification to make the bail more

8   consistent with the practice in this district.  And they are

9   willing do that judge.  I just would note, as I explained to

10  the AUSA, since Your Honor is inquiring about these specifics

11  now, the representation as to the one suretor is that he has a

12  million dollars in equity.  And that is correct, but that is

13  involving the fact that he's currently refinancing.  When the

14  refinancing is done, if approved, he will still have a million

15  dollars in equity.  It will slightly adjust the equity, but it

16  will be more than a million dollars.  And that was the only

17  thing I was going to request.

18              In addition, obviously, Mr. Bibliowicz is also

19  pledging his home, which has significant equity in it as well,

20  over a million dollars.

21              THE COURT:  Is it just one home by a suretor?

22              MR. CAPOZZOLO:  Two, there's Doug Shapiro, is the

23  one with the million dollars, and his brother -- his brother

24  Frank, I believe, is pledging a home that has about $300,000

25  in equity.

Proceedings                                              6

1      THE COURT:  Again, I'm just getting the parameters

2  of the bond.

3      MR. CAPOZZOLO:  Yes.

4      THE COURT:  What is the relationship between the

5  Shapiros to the defendant?

6      MR. CAPOZZOLO:  They are multi-decade friends, very

7  close family friends, childhood friends, and they live in

8  Miami.

9      I believe the Court also asked for an ankle bracelet

10  with a curfew from 9:00 p.m., I believe 9:00 p.m. to 6:00 a.m.

11      THE COURT:  With GPS monitoring, right?

12      MR. PILMAR:  Yes.  Though, I will note that the

13  Court did not order home detention, which if Your Honor was

14  inclined to grant bond, that's something we would strongly ask

15  the Court to reconsider.

16      THE COURT:  Where is the $500,000 in cash?  Where do

17  you proffer it is coming from?

18      MR. CAPOZZOLO:  There are assets Mr. Bibliowicz has

19  and there are, I believe, certain friends who may also

20  contributed that.  There was a Nebbia order.  So we would make

21  that showing to the Government upon request.  We are in the

22  process of gathering that information.

23      THE COURT:  You know what a Nebbia hearing is,

24  correct?

25      MR. PILMAR:  Yes, Your Honor.

Proceedings                                    7

1          THE COURT:  So you would have to demonstrate that
2   the money was not the source of --
3          MR. CAPOZZOLO:  We understand.
4          THE COURT:  -- was not sourced from the crime.
5          MR. CAPOZZOLO:  Yes, Judge.  We understand.
6          THE COURT:  I understand.  I just needed to
7   understand that.
8          Mr. Pilmar, do you want to be heard?  It is your
9   application.
10          MR. PILMAR:  Yes, Your Honor.  Thank you.
11          I won't repeat from our papers.
12          Defense is right.  It is our burden.  It is not a
13   presumption case.  And the defense is also right that we are
14   not alleging that the defendant is dangerous and that that
15   factor should be at play here.
16          We are focused solely on the risk of flight.  The
17   defendant is not a United States citizen.  He is a citizen of
18   Colombia and France with significant foreign ties.
19          THE COURT:  Who are those significant foreign ties?
20          MR. PILMAR:  He travels routinely.  I think we put
21   in our papers that he has traveled abroad over 60 times since
22   2019, including over 40 occasions to Colombia.
23          THE COURT:  Are you alleging that those trips to
24   Colombia are in connection with the crime, the crime alleged?
25          MR. PILMAR:  He did meet with co-conspirators when

Proceedings                                                  8

1    he went to Colombia, but I'm not saying that all of those

2    trips are for that purpose.

3            My understanding is is that the defendant has family

4    members abroad as well, which, I think, cuts both ways.

5            THE COURT:  Which family members?  That wasn't clear

6    from your presentation.

7            MR. PILMAR:  Defense counsel correct me if I am

8    wrong, I believe it is either a sibling or an uncle who lives

9    in Colombia.

10           MR. CAPOZZOLO:  There are extended family:  Aunt,

11   uncle, and I believe some cousins.

12           THE COURT:  I'm sorry, what?

13           MR. CAPOZZOLO:  All his children are obviously here,

14   but I think it's cousins and an aunt.

15           THE COURT:  I'm sorry.  I couldn't hear.

16           MR. CAPOZZOLO:  Aunt and uncle.

17           THE COURT:  Okay.

18           MR. PILMAR:  Many of his phone contacts of -- and

19   calls are with people abroad.  I submit this is not someone

20   who has lived in the United States since they were 18 and, you

21   know --

22           THE COURT:  Well, he has lived here since --

23           MR. PILMAR:  Sorry, Your Honor.  I was trying to

24   finish my train of thought.

25           It is not that he has lived here since he was 18 and

Proceedings                                        9

1   his only roots are in the United States.  He has significant

2   roots abroad.  And for that reason and given the hefty prison

3   sentence that he is facing upon conviction, there is a

4   significant incentive to leave the country because he has all

5   of these roots abroad and he isn't just, you know, focused on

6   living his life in the United States that given the lengthy

7   prison sentence, and if he is convicted, he will likely be

8   deported anyway.  There is a strong incentive to flee the

9   country now, avoid that prison sentence and go to Colombia

10  where he would be sent anyway after the prison sentence.

11          I just want to also rebut a couple things that the

12  defense brought up in their letter.

13          The defense has made a really big deal about the

14  fact that we said originally -- we are not saying it in these

15  papers -- it wasn't before the magistrate in Florida, that the

16  defendant was on a one-way flight to Colombia.  So when he was

17  arrested and when we wrote our original detention memo, the

18  Government databases showed that he had a one-way ticket to

19  Colombia.  It did not show a return flight.  After he was

20  arrested, defense counsel said no, he has a return flight on a

21  different airline.  It wasn't in the databases.  I don't know

22  why that's the case.  I'm not CBP.  But that's the information

23  we got.  And the magistrate judge in Florida knew that.  And

24  we have corrected it in our papers now.  And we were never

25  relying on that fact, that it was a one-way flight as the

Proceedings                              10

1  reason why we were seeking detention.  We were going to seek

2  detention regardless.

3          So, I think the defense has really made a mountain

4  out of a molehill.  He is either accusing the Government of

5  bad faith, which 100 percent we were never intending to paint

6  a false impression.  That is absolutely untrue or a shoddy

7  investigation.  And the fact that the CBP database didn't have

8  this information is just not indicative of the years' long

9  investigation and the dozen of the electronic devices we have

10 collected, the myriad of bank subpoenas we have.  They are

11 just not connected at all.  I just really wanted to reflect

12 that, especially the notion in their papers that this may have

13 been an effort to paint a false impression, which it was 100

14 percent not the case.

15         THE COURT:  I know they provided you with the

16 information that showed there was a return flight.  Did you

17 subsequently locate that in database?

18         MR. PILMAR:  I don't think we have seen it in this

19 database the last time I checked, Your Honor.  I just don't

20 know why it's not in there.  I honestly hadn't focused on why

21 that is the fact, because it appears to be a legitimate record

22 defense counsel is giving us.  We are not doubting them.  I

23 just think sometimes Government databases aren't perfect.

24         THE COURT:  Okay.

25         MR. PILMAR:  And the other thing I wanted to focus

1   on, Your Honor, is that the defense makes a big deal saying

2   that we presented a bare-bones indictment with an agent who

3   didn't know anything and that there's, you know, no proof that

4   the defendant committed the crime.

5           First of all, obviously, a Grand Jury has returned

6   an indictment.  The indictment is not a lengthy speaking

7   indictment, but it has a few paragraphs of information outside

8   of the charging language.  And it is the practice here in this

9   district to proceed by proffer and that's what we are doing in

10  our letter, we are proceeding by proffer.

11          In the Southern District of Florida, my

12  understanding is the practice that the Government proceed by

13  proffer as sort of a direct examination and then an agent is

14  there for cross-examination.  It is my understanding that it

15  is routine in the Southern District of practice to use local

16  case agent who tries to become as familiar with the facts as

17  possible and not to have the case agent stand in for a lengthy

18  cross-examination.  So I just want to rebut the fact that

19  there is a notion that we did this in some way to hide

20  something from the judge in the Southern District or anything

21  like that.

22          THE COURT:  No, but perhaps you can elaborate on the

23  nature of your evidence.  You say in general terms the

24  evidence that you have, but the judge's concern in Florida was

25  that it was very conclusory.  I think you do need to elaborate

Proceedings                                              12

1   on the nature you have.  You talk about recordings.  Is the

2   defendant on these recordings?

3           You know, you just need to tell me, I think, a bit

4   more to the extent that you want the Court to rely heavily on

5   the issue -- to rely, rather, on the weight of the evidence.

6           MR. PILMAR:  Yes.  Of course the way -- two points

7   about that, Your Honor, and I'm going to get to answering your

8   question directly, of course.

9           What I will say is that while the strength of the

10  evidence is a factor the Court must consider, and we do

11  believe the evidence is strong here, we are not asking for

12  that factor to be the deciding factor in this case.  What we

13  think makes this case different than other potentially money

14  laundering cases with other defendants is really the

15  defendant's citizenship and the strong foreign ties and the

16  movement of money, you know, frequently from the United States

17  to Colombia.  I'm going to address the strength of the

18  evidence and I'm going to talk in a little more detail.  I

19  just wanted to make the point I think there has been a lot of

20  focus on the strength of the evidence and while that is

21  factor.

22          The main reason why we sought detention here is the

23  personal characteristics of the defendant's ties abroad in a

24  way that we may not have sought and, honestly, probably would

25  not have sought detention if the defendant was a United States

Proceedings                                          13

1  citizen, you know, rarely travels abroad, does not go to

2  Colombia all the time, et cetera.  I just wanted to make that

3  point.

4           There are recordings that the defendant is on.  I

5  will admit the recordings are not smoking guns that say yes,

6  I'm laundering drug money.  That's not what we are saying.

7  But there are recordings where the defendant discusses the

8  business of moving money, so his voice on those recordings.

9           A very important piece of evidence in this case are

10 bank documents.  So the defendant had -- I just want to get

11 you the exact number, Your Honor.  I think it is nearly 20

12 different bank accounts here in the United States.  And he

13 used a web of bank accounts to receive and send money through

14 cryptocurrency.  The defendant is on those bank documents.

15 Many of them have his signature on them.  And in many of them,

16 there are false statements to the banks, which, in our view,

17 is strong evidence of his intent.  For example, one bank

18 document for Treebu, LLC, that's his company, says that the

19 business was, quote, consulting in real estate property

20 management to clients in the USA.  That's false.  That was not

21 business.  The business was moving cryptocurrency to and from

22 the United States, mostly to Colombia for commission.  So that

23 was a false statement to a bank, which we believe is strong

24 evidence of intent.

25           And another big part of our evidence, Your Honor,

Proceedings                                          14

1   are our witness statements, multiple witnesses that will tie

2   the defendant as the leader of this company.  And more

3   important --

4        THE COURT:  When you say company, does the company

5   have a name or are you just calling the organization the

6   company?

7        MR. PILMAR:  It was mostly called Treebu.  There is

8   some change of the name generally.  We anonimized it in our

9   indictment.  But it is Treebu, T-R-E-E-B-U, LLC, and we are

10  going to have multiple witnesses who will talk about the

11  defendant's role in the company, how he was intimately

12  involved in all aspects of its operations and witnesses who

13  will say that the defendant knew that he was moving drug

14  proceeds.  Obviously, we're not going to reveal that 3500

15  material at today's proceeding.  If that's a deal-breaker, we

16  understand that the Court will order release, that's fine.  We

17  are just not prepared to out our --

18       THE COURT:  I'm sorry, you said if the Court orders

19  release.

20       MR. PILMAR:  I was just saying we are not going to

21  reveal to the defense witness statements at this stage without

22  a trial date for the safety of our witnesses.  I was just

23  saying if that's a deal-breaker for the Court, we understand,

24  and we will ask the Court to impose stricter conditions of

25  release.  We're just not willing, of course, to reveal 3500

1   material three days after arrest.

2           THE COURT:  So let's get to those stricter

3   conditions of release.

4           What stricter conditions of release would satisfy

5   the Government?

6           MR. PILMAR:  So, a couple of things, Your Honor.

7   First, the defense proposed a $10 million dollars bond.

8           THE COURT:  Right.

9           MR. PILMAR:  The magistrate judge went down to $5

10  million.  There is no indication in the record, and I believe

11  defense counsel agrees, there was no real discussion about why

12  the judge did that.

13          Is that correct?

14          MR. CAPOZZOLO:  I will say the judge didn't put

15  conditions on the record, but I think the judge --

16          THE COURT:  You offered 10 million; correct?

17          MR. CAPOZZOLO:  We offered $10 million.

18          THE COURT:  Supported by 1 million in cash?

19          MR. CAPOZZOLO:  Yes.

20          THE COURT:  Is that still the offer?

21          MR. CAPOZZOLO:  Obviously, Judge, we prefer the

22  other bond, but if Your Honor sets that as a condition, we

23  will meet that.

24          THE COURT:  Okay.

25          MR. PILMAR:  And then the biggest thing, Your Honor,

```
                        Proceedings                    16
```

1   is we would ask -- if Your Honor wants to order release, we

2   think there has to be home detention.  So, in a case like

3   this, with a strong risk of flight, we do not believe a curfew

4   is appropriate where the defendant can be out for 15-plus

5   hours a day in South Florida, which is a quick boat ride away

6   out of the United States.  And as Your Honor knows, ankle

7   monitors only limit the defendant's head start.

8          So if there is a strict -- I'm sorry.  If there is

9   strict home detention, it will be a lot easier for Pretrial

10  Services to notice if the defendant has either cut his monitor

11  or has gone someplace outside of the very tight strictures of

12  his home.

13         If he is able to roam around South Florida for 15

14  hours a day and then he doesn't come back at 10:00 p.m., it is

15  hard o know where he has gone and he could just be at a marina

16  on a boat out of the country.

17         THE COURT:  You are talking about GPS monitoring?

18         MR. PILMAR:  GPS monitoring, ankle monitoring.

19         THE COURT:  And home detention?

20         MR. PILMAR:  And home detention, where he could not

21  leave his home except for the strictest of reasons, medical

22  appointments and things like that.

23         THE COURT:  The one concern that I would have would

24  be he's going to have to come to New York.

25         MR. PILMAR:  Yes, Your Honor.

```
                          Proceedings                    17
```

1      THE COURT:  And how do you envision that we could --

2      MR. PILMAR:  So I have another case with two

3  defendants who are on home detention in Florida.  When it is

4  time for court appearances, defense counsel lets us know the

5  flights that they are going to take.  We alert Pretrial

6  Services that that monitor should go straight from the home to

7  the airport.  And I guess there is -- and we would have his

8  passport.  And I guess there is a little bit of faith that you

9  are not a domestic flight, not an international flight.  In

10 one of my cases the defendant is quite elderly and his counsel

11 actually flies with him when he comes from Florida to New

12 York.  That's a lot different.  Like, knowing a specific day

13 that he's going to come up here is very different than 15

14 hours a day with an ocean.

15      THE COURT:  Yes, I agree.

16      What is the defendant's position with respect to

17 that?

18      MR. CAPOZZOLO:  Judge, the reason he was granted

19 that time in the curfew was because of his relationship with

20 his children.

21      THE COURT:  He didn't want to be at home with them?

22      MR. CAPOZZOLO:  No, no.  He wants to be able to go

23 to school.  He has been the sole caregiver.  His wife died.

24      THE COURT:  I understand.

25      MR. CAPOZZOLO:  And he goes to all of their events.

1   He's very heavily involved in the children's lives.  That is

2   the one thing I think you saw from the 40 people who submitted

3   messages to the Court.  He is deeply involved with his

4   children's lives.  I believe it would do some disservice for

5   him not to have any ability to leave the house.

6            THE COURT:  The Government has pointed out what I

7   think is a substantial risk of flight.  We are talking about

8   -- we haven't gotten to that.  We are now talking about are

9   there possibly conditions or a combination of conditions that

10  would deal with that.  And what the Government has pointed out

11  is simply not insignificant.

12           I'm trying to fashion something that would allow him

13  to stay with his children.

14           I think the Government, in talking about home

15  detention, I think that that's a reasonable request in light

16  of the very -- a very reasonable request in light of the risk

17  of flight.

18           MR. CAPOZZOLO:  Judge, you have the authority.  I'm

19  obviously going to accept that rather than him being detained

20  in a detention facility.  So, other than telling you what the

21  facts were in the record, I don't have an additional reason to

22  deny that.

23           THE COURT:  Right.

24           MR. CAPOZZOLO:  The only thing I would ask, Judge,

25  is there may be some family events, non-routine, where might

```
                          Proceedings                    19
```

1   want to --

2              THE COURT:  He can make an application to the Court.

3              MR. CAPOZZOLO:  Yes.  I was just suggesting.

4              PRETRIAL SERVICES OFFICER:  Your Honor --

5              THE COURT:  Yes, sir.

6              PRETRIAL SERVICES OFFICER:  I apologize.

7              THE COURT:  Do you want to put your name on the

8   record?

9              PRETRIAL SERVICES OFFICER:  Pretrial Services

10  Officer Chijioke Ezenyilimba.

11             I just wanted to make the clarification that if the

12  defendant is on home detention, Pretrial Services is, with the

13  language that is provided on the bond, able to approve

14  specific activities as directed by the Court.  So, if the

15  defendant does have obligations to take his children to

16  doctors' appointments, et cetera, as long as he provides the

17  appropriate paperwork, Pretrial Services can give him a

18  schedule for those things, so that would be no issue.

19             As well as I would like to clarify, on the bond, it

20  is not GPS monitoring; it is location monitoring as directed

21  by Pretrial Services so that we are able to give the

22  appropriate technology based on the things the defendant need

23  to do.

24             THE COURT:  Are you suggesting something other than

25  GPS?

Proceedings                              20

1        PRETRIAL SERVICES OFFICER:  So, we just want to make

2   sure that on the bond if the defendant does need to do

3   specific things, for example, an MRI or he needs to do any

4   other things, we would just have the ability to change the

5   technology even if it's temporarily.  But we can tell the

6   Southern District of Florida that they need to have him on GPS

7   monitoring and monitor his movements for the most part of his

8   supervision.

9        THE COURT:  Why would you have to change the nature

10   of the monitoring?

11        PRETRIAL SERVICES OFFICER:  It just depends on

12   things, like with specific defendants, they just have

13   different activities things they need to do that they may need

14   to --

15        THE COURT:  Well, the activities here are at a

16   minimum as far as the Court is concerned in light of the risk

17   of flight.

18            So, in the beginning, I think you should notify the

19   Court if he wants an exception to be approved.  And then, if

20   it turns out that he is abiding by everything and then maybe

21   it can be Pretrial Services's discretion.  But in the

22   beginning, if there are to be exceptions, I want the Court

23   notified and the Government notified.

24        PRETRIAL SERVICES OFFICER:  Understood.  That's

25   fine.

Proceedings                                    21

1          THE COURT:  So I'm going to set the bond at the

2    original 10 million, with a $1 million deposit.  The suretors

3    are going to have to post their homes --

4          MR. CAPOZZOLO:  Yes, Judge.

5          THE COURT:  -- and not further encumber them.  The

6    two that have said that they are going to do that.

7          Have they been brought in and had this explained to

8    them?

9          MR. CAPOZZOLO:  There is that discussion on the

10   record, but I will clarify these additional conditions.  I am

11   certain they will agree to that.

12         Judge, the only one I wanted to be sure of, the one

13   that is refinancing their home now that will still have a

14   million dollars, can they proceed through that refinancing?

15         THE COURT:  How long is that going to take?

16         MR. CAPOZZOLO:  Two weeks.  It is very short.

17         THE COURT:  Well, he is not getting out until the

18   house is pledged.

19         MR. CAPOZZOLO:  I understand.

20         THE COURT:  He has to meet all of the conditions of

21   bond before he is released.

22         MR. CAPOZZOLO:  I understand.

23         MR. PILMAR:  Sorry, Judge.

24         My understanding from my other case where I have

25   defendants in Florida is that things work a little bit

Proceedings                                                    22

1   different there and that they don't put leans on in the same

2   way -- you know how we file a confession of judgment in State

3   Court here, my understanding is that they don't do that in

4   Florida due to like different laws that they have down there.

5   So, my understanding is pledging there, it's actually better

6   for defendants in a way that -- it's just that defendants and

7   the suretors agree in federal court that this house is being

8   put up.  They don't actually have to file a confession of

9   judgment in State Court in Florida.  If they do encumber the

10  home in any way, they will have violated the bond and the bond

11  can be revoked.  They just don't have that middle step where,

12  like, there's a confession of judgment, so if someone goes to

13  look up the property deed, they will see a confession of

14  judgment like we have in New York.

15         So, I just want to make sure for the defendant's

16  benefit that Your Honor doesn't impose a requirement that,

17  like, they file that document because then we're just going to

18  be back here next week asking to modify the bond.  So I would

19  just ask that the conditions are that all the suretors -- that

20  the defendant and all the suretors agree they cannot encumber

21  their home in any way.

22         THE COURT:  And they understand the home will be

23  sold if he doesn't appear?

24         MR. PILMAR:  Exactly.

25         MR. CAPOZZOLO:  They understand that.  They did

Proceedings                                        23

1   discuss that on the record at the magistrate proceeding and I

2   personally discussed that with each of the suretors, they are

3   betting their homes that the defendant returns to court.

4           THE COURT:  There is a requirement that all of the

5   children surrender their passports.

6           MR. CAPOZZOLO:  Yes, Judge.

7           MR. PILMAR:  We would like that condition to stay,

8   Your Honor.

9           THE COURT:  And his passport obviously.

10          MR. CAPOZZOLO:  They have been seized by the

11  authorities.

12          THE COURT:  The passports have been?

13          MR. CAPOZZOLO:  Yes.  They were seized when they

14  executed the search warrant.

15          THE COURT:  Why?

16          MR. CAPOZZOLO:  They were on the inventory for the

17  search warrant return.

18          THE COURT:  The children's passports?

19          MR. CAPOZZOLO:  No, no, Mr. Bibliowicz.  We will

20  have the children's passports turned over.

21          THE COURT:  Because the one son is in college,

22  correct?

23          MR. CAPOZZOLO:  Yes.

24          THE COURT:  And then there is a child at home who is

25  14?

Proceedings                                    24

1          MR. CAPOZZOLO:   There's two children, 14 and I think

2     17.  We will have all those passports turned over.

3          THE COURT:   Okay.

4          MR. PILMAR:   And, Your Honor, the Government --

5     while we want the suretors to have signed before the defendant

6     is released, we wouldn't object to the defendant being

7     released before that refinancing process is finished.

8          THE COURT:   As long as he has signed?

9          MR. PILMAR:   As long as he signs and understands

10    that he cannot do anything else to lose the title to that

11    home.

12          I wouldn't want Your Honor to think that the

13    defendant should be released and it gets held up by some

14    banking thing.  I just wouldn't think that would be fair to

15    the defendant.  As long as the suretor knows if the suretor

16    does anything else beside that, that home can be seized.

17          THE COURT:   That's fine.  Are there any other

18    conditions -- well, all of the conditions imposed by the judge

19    in Florida are still imposed.

20          MR. CAPOZZOLO:   The only one we request to rescind

21    was the 100,000 corporate surety.

22          THE COURT:   That will be rescinded.  We don't use

23    bail bondsmen here.

24          MR. CAPOZZOLO:   Thank you.

25          MR. PILMAR:   The only other main one that was on the

Proceedings                                        25

1   bond, I just want to make sure Your Honor keeps it, that the

2   defendant was prohibited from certain banking activities,

3   including transferring cryptocurrency.

4           THE COURT:  What is his job, by the way?  That

5   wasn't clear to me.  What does he do?

6           MR. KAUFMAN:  Your Honor, he's essentially a

7   financial engineer type.  Mostly what he has done for the last

8   couple of years is he created a trading strategy using

9   treasury bills that I don't profess to understand, but it just

10  involves buying and selling treasury bills and options and the

11  like on treasury bills.

12          THE COURT:  Does he have a name to this company?

13          MR. KAUFMAN:  I don't know offhand, Your Honor.

14  It's something that he just does for himself with his own

15  money.

16          THE COURT:  Interesting.

17          Well, there was a requirement that he not deal with

18  cryptocurrency?

19          MR. PILMAR:  Right.  That he not be employed by a

20  financial banking institution, which I don't think will be a

21  problem, or working with any cryptocurrency platforms.  I

22  don't know if what he is doing now involves cryptocurrency in

23  any way, but we would ask Your Honor order that the defendant

24  cannot buy or sell any cryptocurrency.

25          MR. CAPOZZOLO:  That's fine, Your Honor.

Proceedings                                          26

1           THE COURT:  Okay.  Anything else?

2           So the changes from the bond in Florida are that

3    it's from $5 million to $10 million.  It is supported by a

4    million dollars in cash.  The Government, if it wishes, can

5    make the inquiries, the Nebbia inquiries.

6           MR. PILMAR:  Yes, Your Honor.

7           THE COURT:  It is supported by the suretors who

8    signed the bond there and the two suretors who understand that

9    they are pledging their homes and the equity in their homes,

10   home detention, GPS monitoring, no involvement in

11   cryptocurrency or financial transactions with banks.

12          MR. PILMAR:  Employed by financial banking

13   institutions or transacting in cryptocurrency.

14          THE COURT:  Okay.  Is there anything that I have

15   overlooked from the Government's perspective?

16          MR. CAPOZZOLO:  And just to surrender the passports.

17          MR. PILMAR:  Yes.

18          THE COURT:  And the surrender of all of the

19   passports.

20          Anything further from the Government?

21          MR. PILMAR:  No, Your Honor.

22          And is it Your Honor's intention that the defendant

23   won't be released until the suretors actually sign on

24   Monday --

25          THE COURT:  Yes.

```
                        Proceedings                    27
```

1        MR. PILMAR:  -- or whenever the defense can do it?

2        THE COURT:  Yes.  Absolutely.

3        MR. CAPOZZOLO:  Judge, can we continue the stay of

4   removal so that way if we meet -- he's in Miami right now --

5   that way if we meet the conditions, he is released there?

6        THE COURT:  Yes.  It is better to have everything

7   happen --

8        MR. PILMAR:  Of course.  Absolutely.  I will let the

9   marshals know today.

10       THE COURT:  Anything else?

11       MR. CAPOZZOLO:  No, Judge.

12       MR. PILMAR:  I don't believe so.

13       THE COURT:  Well, we need to set a date for this.

14       MR. PILMAR:  I was just going ask if we can set a

15  date for either arraignment before the magistrate.

16       THE COURT:  I want it here.

17       MR. PILMAR:  We will do the arraignment here?

18       THE COURT:  Yes.  We have settled all of the bond

19  issues, so there is no reason not to have it here.

20       MR. PILMAR:  Okay.  Yes, to set a date for

21  arraignment and an initial status conference, that would be

22  great, Your Honor.

23       THE COURT:  So if you get all of this worked out, a

24  week from Monday, maybe.

25       THE COURTROOM DEPUTY:  That would be March 10th.  We

Proceedings                                    28

1   can do March 11th.

2            MR. PILMAR:  March 10th or 11th are both fine with

3   me.

4            MR. CAPOZZOLO:  I would take the 11th just in case

5   there is little issues.

6            THE COURT:  Okay.

7            THE COURTROOM DEPUTY:  March 11th at 12 o'clock?

8            MR. CAPOZZOLO:  12 o'clock?

9            THE COURTROOM DEPUTY:  Yes, 12:00 p.m.

10           THE COURT:  Thank you.

11           MR. CAPOZZOLO:  Thank you, Your Honor.

12           MR. PILMAR:  Thank you, Your Honor.

13           (Matter adjourned.)

14                    *    *    *    *    *

15  I certify that the foregoing is a correct transcript from the
    record of the proceedings in the above-entitled matter.

16

17  /s/ Michele Lucchese                February 28, 2025
    _____          _____
18  Michele Lucchese                    DATE

19

20

21

22

23

24

25